**PASSTOU, INC., et al., Appellants,**

v.

**SPRING VALLEY CENTER, Appellee.**

No. 84–1628.

District of Columbia Court of Appeals.
Argued Sept. 12, 1985.
Decided Nov. 27, 1985.

Gregg Schaaf, with whom Ben Paul Noble, Washington, D.C., was on the brief, for appellants.

Jack C. Sando, Washington, D.C., for appellee.

Before PRYOR, Chief Judge, and ROGERS, Associate Judge, and GALLAGHER, Senior Judge.

PRYOR, Chief Judge:

In this case, attorney Ben Paul Noble represented three tenants of the Spring Valley Center in litigation with their landlord over the correct method for calculating the real estate tax component of their "additional" rent for 1982. At the conclusion of the litigation, the court ruled that the landlord had employed an improper method for allocating the real estate tax component of the tenants' additional rent for 1982. As a result of this ruling, those tenants at Spring Valley Center chargeable with additional rent for 1982, received credits against their additional rent assessments for 1983 totalling $80,317. Noble then requested an award of attorneys' fees and expenses. Citing the common fund or benefit doctrine, Noble sought fees not only from the three tenants he had represented, but also from those tenants at Spring Valley Center who had benefitted from his efforts but had not participated in the original litigation. After a hearing, the trial court denied Noble's motion for attorneys' fees. This appeal followed. Finding no abuse of discretion in the trial judge's ruling, we affirm.

## I

Spring Valley Center, a limited partnership (the Partnership), owns property located at 4801 Massachusetts Avenue, N.W. For zoning and real estate tax assessment purposes, the land is divided into two lots. On one lot, the Partnership constructed an office building with a shopping mall named Spring Valley Center and leased space to approximately forty tenants. A supermarket and parking area are located on the second lot.

The leases of approximately 26 tenants at Spring Valley Center contain a provision requiring the annual payment of "additional" rent. This provision operates to pass along certain of the landlord's operating costs to tenants, and provides, in pertinent part, as follows:

In addition to the base monthly rental aforesaid, Tenant will pay its proportionate share of Landlord's cost of operating the building.... The costs of operating the Building shall include, inter alia, all fees, charges and expenses which landlord may determine on an accrual basis, relating to servicing, cleaning, maintaining, repairing and protecting the Building and grounds; common utilities; *real estate taxes;* fire and extended coverage insurance premiums; management fees and leasing commissions. [Emphasis added.]

In 1982, the District of Columbia Department of Finance and Revenue (the District) assessed and collected real estate taxes from the Partnership on the two lots located at 4801 Massachusetts Avenue. In the Partnership's view, however, the District's assessment of taxes on the two lots did not accurately reflect the higher density and thus greater value of the lot containing Spring Valley Center. To correct this perceived imbalance, the Partnership reallocated the taxes as between the two lots in assessing the tenants of Spring Valley Center additional rent for 1982. Because of this reallocation, the total of real estate taxes charged the tenants of Spring Valley

Center as additional rent for 1982 was in excess of that assessed by the District.

Upon receiving their additional rent assessments for 1982, all but three tenants at Spring Valley Center paid the amount charged.[1] Three tenants, however, objected to the method used to calculate additional rent and refused to pay.[2] These three tenants retained Noble to represent them, paying him a fee of $1,050. In the event that litigation should occur, it was recognized that the cost of Noble's services would exceed $1,050; thus, the three tenants agreed that Noble would seek an award of fees and expenses from the court at the conclusion of the case.[3]

Ultimately, the Partnership brought suit against the three non-paying tenants to collect the additional rent assessed for 1982. The case came to trial on December 19 and 20, 1983, on the sole issue of whether the real estate tax component of the tenants' additional rent should be determined in accordance with taxes actually assessed by the District, or on the basis of the allocation made by the Partnership. At the conclusion of trial, the court ruled that the Partnership was required to allocate real estate taxes in accordance with the District's actual assessment.[4] Based on this ruling, the parties to the litigation agreed that $80,317 in overcharges would be returned, on a pro-rata basis, to all tenants at Spring Valley Center who had paid additional rent for 1982.[5]

Subsequent to the court's ruling, Noble, on January 6, 1984, requested an award of attorneys' fees. In the motion, Noble asserted that, as a result of the litigation in this case, the tenants at Spring Valley Center had become entitled to a reduction in the additional rent originally charged by the Partnership for 1982. Relying upon the common benefit or common fund doctrine, Noble asserted that all the beneficiaries of the litigation should "be required by the court to pay their fair share of the costs of litigation, including attorneys' fees."

Significantly, Noble's motion for attorneys' fees did not contain a request that the court impound, or otherwise restrain, the distribution of any funds to which the non-party tenants had become entitled as a result of the litigation. Moreover, at no time did Noble ask the court to control the manner in which the Partnership would return the overcharges of additional rent for 1982.

During February 1984, the Partnership mailed notices of additional rent assessments for 1983 to the tenants of Spring Valley Center. In these notices, the Partnership informed each tenant that it was receiving a credit against its 1983 additional rent representing its pro-rata share of the $80,317 in overcharges for 1982.[6] Thus, the Partnership distributed the overcharges to the non-party tenants in the form of a credit against 1983 taxes not yet

1. Several tenants paid under protest.

2. The three tenants initially raised concerns regarding several aspects of the additional rent calculation for 1982. However, only the issue of the calculation of the real estate tax component of additional rent was litigated.

3. The three tenants who retained Noble were not liable for attorneys' fees in excess of the $1,050 paid to him at this time.

4. As a result of this ruling, the judgment for additional rent obtained by the Partnership against the three non-paying tenants was in an amount substantially less than that initially assessed.

5. Only those tenants at Spring Valley Center chargeable with additional rent for 1982 were benefitted by the court's ruling and the subsequent agreement between the parties to return the overcharge for 1982. As used in the remainder of this opinion, "tenants" refers to tenants at Spring Valley Center who benefitted from the underlying litigation in this case.

6. While the Partnership attributed the overcharge "primarily ... to an error by the District ... in its assessment of real estate taxes," the trial court in its Memorandum and Order found that "it is clear that the adjustment resulted from this court's ruling in the instant action, not from an error by the District."

collected, and not as a refund of 1982 taxes that had already been paid.

On March 12, 1984, a hearing was held on Noble's request for attorneys' fees.[7] At the hearing, Noble proposed a method for implementing an award of attorneys' fees from the non-party tenants of Spring Valley Center who had benefitted from the litigation. For those tenants who had not yet paid their additional rent for 1983, Noble suggested that the court order the Partnership to implement an adjusted credit against the additional rent assessment for 1983. For those tenants who had already paid their 1983 additional rent, Noble suggested that the court order an adjusted credit against the additional rent assessment for 1984. In essence, the adjustment suggested by Noble would decrease the credit already implemented by the Partnership in the amount of the tenants' proportionate share of the fee awarded by the court. As Noble later acknowledged, under the proposed method, there would be "37 tenants from [whose] pockets [the Court is] going to be ordering money [paid] to [him]."

Following the hearing a notice of the fee application, dated March 20, 1984, was sent to all non-party tenants at Spring Valley Center.[8] The notice stated that a hearing on the fee application would be held on April 16, 1984, and that the recipients could appear "and be heard with respect to whether this request should be granted; if so, what amount shall be awarded; and how it shall be allocated among the beneficiary tenants." Noble's statement for services was attached to the notice.

No tenants appeared at the April 16 hearing. After taking the matter under advisement, the trial court, on October 14, 1984, denied Noble's request for attorneys' fees. In so doing, the trial court found

that, while Noble had met the criteria for an award of fees, "[t]here is no fund or equivalent mechanism affording the court a method to reach monies with which to pay a fee." This appeal followed.

## II

Under the "American Rule," a party who prevails in litigation is not entitled to recover attorneys' fees from the losing party. *See Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975); *Launay v. Launay, Inc.*, 497 A.2d 443, 449 (D.C.1985); *In re Antioch University*, 482 A.2d 133, 135 (D.C.1984). While this rule denying fees to a prevailing litigant is "deeply rooted in our history," *Alyeska, supra*, 421 U.S. at 271, 95 S.Ct. at 1628, exceptions limiting its broad scope have been recognized. Thus, it is now well accepted that attorneys' fees may be recovered when the losing party "has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons....'" *Id.* at 258–59, 95 S.Ct. at 1622 (quoting *F.D. Rich Co. v. United States*, 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974)); *see also In re Antioch University, supra*, 482 A.2d at 136; *Andrews v. District of Columbia*, 443 A.2d 566, 569 (D.C.), *cert. denied*, 459 U.S. 909, 103 S.Ct. 216, 74 L.Ed.2d 172 (1982). A second exception to the American Rule "permits an award when the legislature has made 'specific and explicit provisions for the allowance of attorneys' fees under selected statutes.'" *Launay v. Launay, Inc., supra*, 497 A.2d at 450 (quoting *Alyeska, supra*, 421 U.S. at 260, 95 S.Ct. at 1623). A third exception—under which the request for fees is made in this case—permits an award of attorneys' fees to a person who preserves or recovers a fund or property for the benefit of oth-

---

7. Noble indicated that at the time he was preparing the motion for attorneys' fees, he "suggested" to the Partnership's attorney "that he advise his client not to refund or credit until [the court] disposed of the pending motion." Appellant further asserted that Spring Valley "had notice through its attorney of the pendency

of the motion and should not have made the refunds or the credits."

8. This was the first formal notice non-party tenants had received of Noble's application for attorneys' fees.

ers. *Alyeska, supra,* 421 U.S. at 257, 95 S.Ct. at 1621; *In re Antioch University, supra,* 482 A.2d at 136; 6 J. MOORE, W. TAGGART & T. WICKER, MOORE'S FEDERAL PRACTICE § 54.77[2], at 1705 (2d ed. 1985). The common fund or benefit exception to the American Rule is fully recognized in the District of Columbia. *See District of Columbia v. Green,* 381 A.2d 578, 580 (D.C.1977); *see also Launay v. Launay, Inc., supra,* 497 A.2d at 449.

The common fund or benefit doctrine[9] was first recognized by the Supreme Court in 1882 in *Trustees v. Greenhough,* 15 Otto 527, 105 U.S. 527, 26 L.Ed. 1157 (1882). As noted in *Alyeska,* the Court in *Greenhough* recognized

> the historic power of equity to permit the trustee of a fund or property, or a party preserving or recovering a fund for the benefit of others in addition to himself, to recover his costs, including his attorneys' fees, from the fund or property itself or directly from the other parties enjoying the benefit.

*Alyeska, supra,* 421 U.S. at 257–58, 95 S.Ct. at 1621–22 (footnote omitted). The doctrine is "employed to realize the broadly defined purpose of recapturing unjust enrichment." Dawson, *Lawyers and Involuntary Clients: Attorneys Fees from Funds,* 87 HARV.L.REV. 1597 (1974). In effect, the doctrine operates to "spread litigation costs proportionately among all the beneficiaries so that the active beneficiary does not bear the entire burden alone and the "stranger" beneficiaries do not receive these benefits at no cost to themselves." *Vincent v. Hughes Air West, Inc.,* 557 F.2d 759, 769 (9th Cir.1977).

In *Alyeska,* the Court articulated the factors that generally characterize cases where an award of fees under the common benefit doctrine is appropriate:

"[t]he classes of beneficiaries were small in number and easily identifiable. The benefits could be traced with some accuracy, and there was reason for confidence that the costs could indeed be shifted with some exactitude to those benefitting." *Alyeska, supra,* 421 U.S. at 264 n. 39, 95 S.Ct. at 1625.[10] In his October 4, 1984 Memorandum and Order, the trial judge in this case concluded that Noble had "ably demonstrated" that all three of these criteria had been met. As the judge explained:

> The number of benefitting tenants, approximately forty, is small and they have been identified; their benefits have been traced; and the cost of the litigation can be shifted to them with accuracy.

Thus, if compliance with the three criteria were the sole consideration in determining whether to award attorneys' fees, such an award in this case would have been appropriate.

In fact, however, the court's discretion to award fees is also limited by the scope of its equitable powers. In *Rees v. City of Watertown,* 19 Wall. 107, 122, 86 U.S. 107, 122, 22 L.Ed. 72 (1874), the Supreme Court recognized that

> [a] court of equity cannot, by avowing that there is a right but no remedy known to the law, create a remedy in violation of law, or even without the authority of law. It acts upon established principles not only, but through established channels.

*See also* 1. S. SYMONS, POMEROY'S EQUITY JURISPRUDENCE § 131 (5th ed. 1941). Applying this principle in this case, the trial judge perceived that an award of attorneys' fees was possible only if the court's equitable powers provided a mechanism through which to effectuate an award. In his Memorandum and Order, the trial judge concluded that "[t]here is no fund or equiv-

9. For the sake of convenience, the exception will be referred to hereinafter as the common benefit doctrine.

10. Under the common benefit doctrine, there is no requirement that the plaintiff proceed by way of a class action suit in order to be eligible

for an award of attorneys' fees. *See Sprague v. Ticonic Nat. Bank,* 307 U.S. 161, 166, 59 S.Ct. 777, 780, 83 L.Ed. 1184 (1939); *see also Washington Gas Light Co. v. Baker,* 90 U.S.App.D.C. 98, 102, 195 F.2d 29, 33 (1951).

alent mechanism affording the court a method to reach monies with which to pay a fee." It is this conclusion that we now review.

In the earliest cases recognizing the right to reimbursement under the common benefit doctrine, the availability of a mechanism for effectuating an award of fees was not an issue because recovery was limited to situations where the litigation had produced or preserved a common fund for the benefit of a group. *See, e.g., Trustees v. Greenhough, supra,* 15 Otto at 527, 105 U.S. at 527. Later, however, the Supreme Court rejected the requirement that the litigation at bar "actually bring money into the court as a prerequisite to the court's power to order reimbursement of expenses." *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 392, 90 S.Ct. 616, 625, 24 L.Ed.2d 593 (1970) (footnote omitted). The common benefit doctrine was extended "to permit reimbursement in cases where the litigation has conferred a substantial benefit on the members of an ascertainable class and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them." *Id.* at 393–94, 90 S.Ct. at 626–27. As one court recently stated, "[c]ontrol over funds or assets is not a necessary condition for the application of the [common benefit] doctrine." *National Treasury Employees Union v. Nixon,* 172 U.S. App.D.C. 217, 221, 521 F.2d 317, 321 (1975) (*NTEU*).

Despite this expansion in the common benefit doctrine, the court's discretion to award fees is limited to those cases where it possesses a mechanism with which to effectuate an award. In cases where a fund has been created or protected, the court simply awards the fees out of the

fund. *See, e.g., City of East Peoria v. Tazewell County,* 60 Ill.2d 263, 266, 327 N.E.2d 331, 333 (1975); *Flynn v. Kucharski,* 59 Ill.2d 61, 66–67, 319 N.E.2d 1, 4 (1974); *Howell v. Highland Cemetery Co.,* 297 Ky. 659, 660–62, 181 S.W.2d 44, 45 (1944).

In stockholder derivative actions, fees have been awarded in the absence of a fund. In those cases, the court has jurisdiction over the defendant corporation, and orders the fees paid by the corporation as a means of spreading the costs to shareholders who have benefitted from the litigation. *See Mills v. Electric Auto-Lite Co., supra,* 396 U.S. at 395, 90 S.Ct. at 627. Similarly, in a successful suit against a union, the court has jurisdiction over the union and can order the fee paid by the union as a means of spreading the costs of litigation to union members who benefitted from the litigation. *See Hall v. Cole,* 412 U.S. 1, 7–9, 93 S.Ct. 1943, 1947–48, 36 L.Ed.2d 702 (1973).[11]

At the outer limit of the court's equitable power to implement an award are cases where the court orders a party before it to pay attorneys' fees out of monies it owes to non-party beneficiaries of the litigation. In *NTEU, supra,* 172 U.S.App.D.C. at 219, 521 F.2d at 319, for example, the underlying litigation resulted in an award of retroactive salary payments to approximately 3½ million federal employees. While leaving determination of the precise mechanism for effectuating an award to the trial judge, the Court in *NTEU* assumed

that the attorney's fees and/or litigation expenses involved will be available from future salaries either through direct payment by the Federal Government into the court (and corresponding deductions

---

**11.** In other cases, the mechanism through which fees are awarded is more attenuated. In *Tenney v. City of Miami Beach,* 152 Fla. 126, 11 So.2d 188 (1942) (en banc), suit was brought by property owners to cancel certain assessment liens imposed by the City of Miami Beach. The property owners prevailed in the suit, and the court awarded attorneys' fees against those who bene-

fitted from the litigation but had not participated in the suit. In *Tenney,* the court made cancellation of a property owner's lien contingent on payment of the fee. *Id.* at 129–31, 11 So.2d at 190. In this way, the court used control over cancellation of the liens as a mechanism through which to effectuate an award of the fees.

from salary checks) or some meaningful equivalent.

*Id.* at 221–22, 521 F.2d at 321–22 (footnote omitted). The award of fees in *NTEU* was made possible, therefore, because the court had jurisdiction over the federal government and could order attorneys' fees paid out of money owed by the government to non-party beneficiaries to the litigation. *See also Silverstein v. Shadow Lawn Savings & Loan Association,* 51 N.J. 30, 44–45, 237 A.2d 474, 482 (N.J.1968).

Yet another indirect method of implementing a fee award was explored by this court in *District of Columbia v. Green, supra,* 381 A.2d at 586. In *Green,* we reviewed an attorneys' fee request made by taxpayer-litigants who had prevented the collection of illegally imposed property taxes by the District of Columbia. Recognizing that, "[t]he fact that appellees prevented the collection of the illegally imposed taxes rather than required their refund after collection, should not, in principle, defeat their recovery," *id.* (footnote omitted), we remanded the case to the trial court for a determination of whether an award of fees was feasible. In so doing, we commented that in order to effectuate an award of fees

> the trial court might exercise jurisdiction over the District to require the collection of the appropriate fees from the benefitting taxpayers, unless the trial court ascertains, on remand, that such course of action is prohibited or unwarranted.

*Id.* As the trial judge in this case noted, however, in *Green,* the statutory scheme underlying the collection of real estate taxes provided the court a mechanism through which to implement an award of fees:

> The imposition of a fee in the form of a tax could, assuming it was not prohibited by statute, effectuate the award because a taxpayer may not refuse to pay a tax; the tax must be paid before an appeal of the assessment can be filed in Superior

Court. Hence, the lower court in *Green* could by its order literally create the "fund" from which to pay the fee.... Any objecting taxpayer would need to pay and then seek refund from the "fund," which could be refused on the basis of the court's order making the award. [Citations omitted.]

■ In this case, the trial judge carefully examined the record to determine whether a mechanism existed through which to effectuate an award of fees. First, he considered whether personal jurisdiction could be imposed on non-party beneficiaries to the litigation as a means of implementing an award of fees. In considering this option, the trial judge acknowledged the tension, which is noted in *American Association of Marriage and Family Counselors, Inc. v. Brown,* 193 U.S.App.D.C. 211, 214 & n. 7, 593 F.2d 1365, 1368 & n. 7 (1979), between *NTEU, supra,* and due process concerns relating to defects in notice and representation which arise from the imposition of personal liability on absent class members in order to award attorneys' fees. We hold that the trial judge did not err in concluding that the imposition of personal jurisdiction on non-parties to the litigation would be beyond the court's equitable powers. *See Schleit v. British Overseas Airways Corp.,* 133 U.S.App.D.C. 273, 274, 410 F.2d 261, 262 (1969); *National Association for Mental Health, Inc. v. Weinberger,* 68 F.R.D. 387, 392 (D.D.C.1975), *rev'd on other grounds sub nom. National Association for Mental Health Inc. v. Califano,* 230 U.S.App.D.C. 394, 397, 717 F.2d 1451, 1454 (1983), *cert. denied,* —— U.S. —— 105 S.Ct. 85, 83 L.Ed.2d 32 (1984). As one commentator has noted, to impose personal jurisdiction under these circumstances, "would enable the successful lawyers not merely to solicit but to conscript clients." Dawson, *Lawyers and Involuntary Clients in Public Interest Litigation,* 88 HARV.L.REV. 849, 919 (1975).[12]

---

12. The court rejected Noble's proposed method of awarding fees because of its unwillingness to impose personal jurisdiction on non-party bene-ficiaries to the litigation. The trial judge recognized that under Noble's suggested approach, "[t]he money would have to come directly from

Next, the court recognized that the litigation had produced no fund under the court's control out of which an award could be made. As the court explained:

> After the Court's ruling on the merits, [the Partnership] did not refund that part of the 1982 taxes that the Court determined had been erroneously charged. Rather, it chose to reimburse the benefitting tenants by a credit on their 1983 taxes, enabling them to pay less than the amount originally charged. The Court was not asked to order [the Partnership] to make that restitution to the tenants in the form of a refund, deducting from the amount refunded sufficient amounts to cover a potential award of fees. Nor was the Court asked to take other action that might have preserved or actually created a fund out of the "settlement" with the non-participating tenants.

Finally, the court sought to determine whether the Partnership owed any money to the non-party beneficiaries out of which an award of fees could be ordered. After examining the record, the court concluded, "There is nothing [the Partnership] owes the tenants out of which a fee could be paid." For this reason, the method of effectuating an award utilized in *NTEU, supra*, was not available.[13]

█ Thus, despite Noble's eligibility for fees under the common benefit doctrine, no award of fees could be made in this case. As the trial judge concluded:

> For the foregoing reasons the Court, after searching for a basis upon which to make an award, cannot award a fee using the method proposed by [Noble]. The Court cannot impose personal liability on the non-participating tenants. Spring Valley cannot be made to pay. There is no fund or equivalent mechanism affording the Court a method to reach monies with which to pay a fee.... There being no such fund or other monies held by the Partnership to which the tenants are entitled, the Court has no equitable power broad enough to make an award.

Because we find no error in this ruling, we conclude that the trial judge did not abuse his discretion in denying Noble's request for attorneys' fees. Accordingly, the decision on appeal is

*Affirmed.*

█

---

the tenants." The trial judge perceived that under this approach, the court could enforce an award of fees against a tenant who refused to pay only by imposing personal jurisdiction. Thus, the court's refusal to impose personal jurisdiction on non-parties to the litigation rendered Noble's suggested approach untenable.

13. The trial judge also distinguished *Green* upon which Noble placed heavy reliance. The trial judge noted that in contrast to *Green,* where the

statutory scheme required taxpayers to pay any tax assessed, the partnership here

> has no authority to compel the tenants to pay anything. If the tenant objects to a charge, he can refuse to pay and the money must be collected from him via a court order to pay. Thus, in *Green* there was "an entity through which the contribution [could] be effected," *Green, supra,* 381 A.2d at 586; here there is no such entity. [Footnote omitted.]