JANDREAU v. WITHERBEE et al.

(Circuit Court of Appeals, Second Circuit. December 7, 1899.)

No. 30.

WHARVES—INJURY TO VESSEL IN LOADING.

Where the loading of libelant's canal boat, of which he was captain, with iron ore, at defendant's dock, is shown to have been under his own direction, the lever man who controlled the flow of ore through the chute into the boat being at a distance, and governed by libelant's orders as to when he should start and stop, as the boat was moved along, defendant cannot be held liable for the wrecking of the boat by the running of too much ore in one place during libelant's temporary absence from the chute, it not being shown that defendant's superintendent or the lever man was chargeable with knowledge that libelant had left the chute unattended to either by himself or a deputy.

Appeal from the District Court of the United States for the Southern District of New York.

This is an appeal from a decree of the district court, Southern district of New York, in favor of libelant for $265.51. The facts sufficiently appear in the opinion.

C. C. Van Kirk, for appellants.

Le Roy S. Gove, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge. Libelant was the captain and owner of the canal boat Lyman Hall, which on June 24, 1896, was being loaded with iron ore at defendants' wharf, on the west shore of Lake Champlain, at Port Henry, N. Y. The loading began about 7 a. m., and, according to the usual custom, the first part of the load was brought aboard in wheelbarrows, and, when dumped, was trimmed by libelant's men. It was trimmed even on the boat, from bow to stern, the whole length of the boat, about one foot deep. The ore brought on in wheelbarrows amounted to about 105 tons. They then began, about 2:30 p. m., to load some 35 tons more through a chute. There were five cars loaded with ore, holding 6 or 7 tons each. These cars ran upon a trestle, which followed the line of the wharf, about 12 or 15 feet back from its front. The trestle was about 20 feet high, and from it there ran a chute so arranged as to catch the ore as it was discharged from the bottom of a car, and conduct it down to drop beyond the edge of the wharf into the boat. The mouth of the chute was 4 or 5 feet above the deck of the boat, the distance varying with the amount of load in the boat and the height of the water in the lake. The chute was arranged with a lever, which opened and shut a gate, thus admitting or preventing the running of the ore. The lever was worked by a man known as the "lever man," from a platform nearly on a level with the trestle. Inasmuch as the chute was stationary, the method of loading practiced that day (as usual) was to move the boat along the dock, so that different parts of the deck came, in succession, under the mouth of the chute. The boat was moved by men standing on it, and pushing it along. On the day in question the bow of the boat was first placed under the chute. When

enough ore had been deposited there from the chute, the lever man was instructed to cut off the flow, and thereupon the boat was moved a little further along, and, being stopped when the chute was somewhat further aft, the lever man was instructed to allow the ore to flow again. Sometimes the ore continued to flow while the boat was pushed along. This operation was repeated until the boat had been pushed so far along that the mouth of the chute was about amidships, the captain up to that time having directed the operation, calling out instructions to the lever man, and regulating the movements of the men who pushed the boat along. Having brought the boat up till the chute was amidships, the captain determined to go forward to measure the draft of the boat, in order to ascertain how much more load to take on. When he started forward, he said to one of the pushers, "Now, you be careful not to put on too much ore; I am going to measure my boat to the bow." This pusher was one of the men employed by defendants to wheel the ore on the boat. It took the captain, as he says, probably four or five minutes to measure the draught, the boat meanwhile being pushed along, and the ore flowing in, and, when the stern reached the chute, the boat was stopped, and a pile accumulated there about four feet high. Having finished at the bow, the captain started for the stern to measure there, when he saw that the boat was pitching by the stern; whereupon he called out to stop the flow, which was done as soon as possible after his call. Nevertheless the load was too much for the boat, and she sprung a leak at the stern, was pulled on the beach, where she grounded on hard bottom, and broke in two.

The district judge, in a brief memorandum, found the libelant to blame for not stopping the chute while he went forward, and that the defendants are not chargeable for the neglect of the "pusher" to attend to the chute properly, the libelant having left that matter in his care. From these findings no appeal has been taken. He further found "that the superintendent and lever man were to blame for sending down ore in such quantities when the captain was forward necessarily, and could be seen there; they must have known such quantities of ore in one place were dangerous." We are unable to concur in this conclusion. The method of loading at that wharf was well known to everybody. To the captain of each boat, himself familiar with its strength or weakness, with its capacity, and with the draught required for his future navigation, it was left to regulate the quantity of ore to be taken in from the chute, and the place where it was to be dumped. Libelant's own testimony on this point is most positive. He said: "When they drop the ore [from the chute], it is for the captain of the boat to say 'Stop,' you see." "When we began on the bow, I told him to let it come easy. He let it go until I told him to stop. Whether it fills the boat or not, I suppose they would wait for me to give orders." The way they "know when to let the ore run and when to stop it [is that] we let him know from down below. We tell him to stop; we tell him to go ahead. * * * [They] take orders from me when to start and stop." The superintendent of the dock, having general charge of all that was going on there, had a right to rely upon the libelant attending to the matter

which he had in particular charge; and the duty of the lever man was undoubtedly to wait for and obey the orders called up to him from the boat, especially as, from the relative positions of the boat, the mouth of the chute, and the platform where the lever man stood, the latter presumably could not see how high the ore was piled at particular localities on the boat. Indeed, the libelant himself admitted that it was a difficult matter to tell from the chute whether or not too much ore was being put on. It would be laying an unfair burden upon these two employés of the defendants to require them to anticipate that the captain would wholly neglect his duty, and to regulate the flow, irrespective of his orders, by their own ideas of what was a sufficient quantity for the boat to take. Unless, therefore, the testimony in the case is such as fairly to charge them with knowledge that the captain was not himself attending to the incoming ore, either personally or by deputy, and that the pile, in one place or another, was increasing to an extent greater than the boat would stand, there is no ground for holding the defendant liable. The statement of libelant that he "supposed" the superintendent saw him go forward is hardly sufficient, even although he might have been seen there if the superintendent's attention had been attracted to him; and we find nothing in the record to charge the lever man with knowledge that there was a dangerous accumulation of ore at the stern. The decree of the district court is reversed, with costs of this appeal, and the cause remanded to the district court, with instructions to dismiss the libel, with costs.