516 A.2d 611

**Robert L. GANTER**

v.

**Leonard KAPILOFF, et al.**

**No. 86, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

Nov. 5, 1986.

Certiorari Denied March 23, 1987.

Dwight C. Stone, Baltimore, for appellant.

L. Marc Zell (Jerry R. Goldstein and Topf, Zell, Goldstein & Handler, P.C., on the brief), Bethesda, for appellees.

Argued before GILBERT, C.J., and MOYLAN and POLLITT, JJ.

GILBERT, Chief Judge.

*Preface*

This appeal tests the truthfulness of the old saw "Finders keepers, losers weepers." Our assay reveals the saw to be toothless, its mettle an alloy of "hot air," folklore, and wishful thinking.

*The Facts*

The brothers Leonard and Bernard Kapiloff are philatelists. In approximately 1976 they purchased two sets of stamps from Robert A. Siegel, Inc., a New York corporation dealing in postage stamps. That the stamps are of considerable value is reflected by their advertised price, $150,-400.00. As far as the brothers knew, those stamps remained in their possession until February 1, 1983. On that date Bernard Kapiloff saw an advertisement, in a nationally circulated catalogue, offering the stamps for sale. He contacted the alleged owner, Robert L. Ganter, and demanded return of the stamps. The demand was refused. The Kapiloffs notified the Federal Bureau of Investigation, and that agency took physical possession of the stamps from J. & H. Stolow, another New York stamp dealer. The stamps had been consigned to Stolow by Ganter, who asserted that they were his property.

Ganter related in a deposition that he acquired the stamps by finding them in a dresser he had purchased for thirty dollars in a used furniture store. The purchase was made, according to Ganter, in "the spring or summer of 1979 or 1980." When he "took the drawers out and started spraying [them] for roaches," Ganter "found a bunch of newspapers, magazines and the stamps." The stamps were in a glassine envelope and "looked very official" because they were accompanied by a certificate with "maybe a gold label on it." No appraisal of the stamps was sought by Ganter at that time because he had "no particular interest in the stamps." Subsequently, he visited someone in New York City who suggested the stamps be appraised. At Thanks-

giving time 1982 Ganter took the stamps to the Stolow Auction House and was told that they were "a rather sensational find."

When Ganter refused the Kapiloffs' demand that he return the stamps to them, they sued him and J. & H. Stolow, Inc., in replevin in the District Court of Maryland for Baltimore City. The action was removed by Ganter to the Circuit Court for Baltimore City where it was amended to include a count seeking a declaratory judgment that the Kapiloffs were "the true owners of the ... stamps."

Following a hearing, Judge Robert I. H. Hammerman entered summary judgment in favor of the Kapiloffs on both counts.[1]

### The Replevin Action

■ An action of replevin is designed to obtain possession of personal property that is wrongfully detained by the defendant. *Shorter v. Dail,* 122 Md. 101, 89 A. 329 (1913); *Anderson v. Stewart,* 108 Md. 340, 70 A. 228 (1908); *Lamotte v. Wisner,* 51 Md. 543 (1879); *Cumberland C. & I. Co. v. Tilghman,* 13 Md. 74 (1859); H. & I. Ginsberg, *Pleading at Law in Maryland* 34 (1937). Indubitably, the Kapiloffs had the right to assert an action in replevin since they averred that they owned the stamps and that Ganter and Stolow had unauthorized possession of the stamps when the action was filed. *Shorter v. Dail, supra; Rogers v. Roberts,* 58 Md. 519 (1882).

■ Where, however, the goods the plaintiff seeks to recover are *in custodia legis,* no replevin lies. *Good v. Board of Police Com'rs of City of Baltimore,* 137 Md. 192, 112 A. 294 (1920); *Glenn v. Gill,* 2 Md. 1 (1852); *Cromwell*

---

1. How one in a declaratory judgment action enters a summary judgment without declaring any rights or findings is not explained. In any event, that procedural aspect of this case is not an issue on appeal. We shall treat the matter as the parties seem to have done—a declaration by the trial court that the ownership of the stamps is in the Kapiloffs.

*v. Owings,* 7 H. & J. 44 (1826). The stamps were recovered by the F.B.I. from Stolow. Under what authority that federal agency took possession of the stamps is not clear. There does not appear from the record before us to have been any judicial process issued that would authorize the F.B.I. to take physical possession of the stamps. Perhaps the Bureau decided that the stamps, if stolen, were evidence. Of course, the agency might have considered that, inasmuch as ownership of the stamps was subject to judicial determination, prudence dictated taking possession of the stamps so as to prevent someone's having to search for them later. Whatever the F.B.I.'s reasons for taking possession of the stamps, the taking does not seem to have been by way of a writ or a search and seizure warrant. Mere possession by the F.B.I. does not mean that agency is holding the stamps *in custodia legis.* There was in the instant case no legally sufficient evidence for the trial court to find that the stamps were *in custodia legis,* and it did not err in rejecting that defense argument.

### *"Finders Keepers"*

Having determined that the Kapiloffs could maintain an action of replevin and that the stamps were not *in custodia legis,* we turn now to Ganter's "Finders-Keepers Theory" of ownership.

The first reference that we have discovered to the adage about "finders keepers" appears in the writings of Plautus who penned in *Trinummis* 1. 63 (c. 194 B.C.), *"Habeas ut nanctus:* He keeps that finds." In Charles Reade's *It is Never Too Late to Mend,* Ch. 65 (1856), the saying was reported as "Losers seekers, finders keepers." That expression has evolved into the more familiar "Finders keepers, losers weepers." Whatever its origin, the maxim is legally unsound.

■ Historically, since at least March 25, 1634, the law of Maryland has been that he who finds lost personal property holds it against all the world except the rightful owner.

Chief Justice Coke in *Isaack v. Clark*, 2 Bylstrode 306 (1615), wrote:

> "[W]hen a man doth finde goods, it hath been said, and so commonly held, that if he doth dis-possess himself of them, by this he shall be discharged, but this is not so, as appears by 12 E. 4 fol. 13. for he which findes goods, if bound to answer him for them who hath the property; and if he deliver them over to any one, unless it be unto the right owner, he shall be charged for them, for at the first it is in his election, whether he will take them or not into his custody, but when he hath them, one onely hath then right unto them, and therefore he ought to keep them safely; if a man therefore which findes goods, if he be wise, he will then search out the right owner of them, and so deliver them unto him...."

*Isaack,* however, is not generally recognized as the premier authority dealing with ownership of lost property. Usually that status is afforded to England's Chief Justice Pratt for his opinion in *Armory v. Delamirie,* 1 Strange 505 (1722). There a chimney sweep found a jewel and took it to a goldsmith. The jewel was delivered into the hands of an apprentice who took out the stones. The chimney sweep was offered a pittance for the socket minus the stones. The sweep sued the goldsmith. In allowing recovery from the goldsmith of the value of the gems, the court articulated the legal precept that the finder of lost property, while not acquiring an absolute ownership in it, does, nevertheless, hold the property "against all but the rightful owner...."

Even though Maryland was not settled at the time of the *Isaack*'s decision, it was the law of the proprietary province from the time of its founding. *Armory,* likewise, was binding in the courts of Maryland. With the advent of the Revolutionary War and subsequent adoption of a State constitution, Maryland carried into its State law those laws of England which existed on July 4, 1776. There they remain except where they have been changed by the Legis-

lature. Md. Declaration of Rights Art. 5.[2] To date the General Assembly has not overruled, amended, altered, or changed, by one iota, the holdings of *Isaack* and *Armory*. Those decisions remain the law of this State.[3]

Maryland is not alone in following *Armory*. Our sister states that have considered the issue also follow *Armory*. *See e.g. Tatum v. Sharpless*, 6 Philadelphia Reports 18 (1865); *Sovern v. Yoran*, 16 Or. 269, 20 P. 100 (1888); *Favorite v. Miller*, 176 Conn. 310, 407 A.2d 974 (1978); *Bowen v. Sullivan*, 62 Ind. 281, 30 Am.Rep. 172 (1878); *Durfee v. Jones*, 11 R.I. 588, 23 Am.Rep. 528 (1877); *Deaderick v. Oulds*, 86 Tenn. 14, 5 S.W. 487 (1887). *See also Preston Coal & Improv. Co. v. Raven Run Coal Co.*, 200 F. 465, 468 (3rd Cir.1912); 1 Am.Jur.2d, *Abandoned, Lost & Unclaimed Property*, § 19; R. Brown, The Law of Personal Property (Raerschenbush, 3rd Ed.1975), § 3.1.

Generally, it may be said that the finder of lost property holds it as a bailee for the true owner. As to all others, the finder's rights "are tantamount to ownership, giving him the right to possess and hold the found goods." *Id.*

In the matter *sub judice*, Ganter, having found the stamps, had the right to exercise ownership over them against the whole world except the true owners, who were determined by Judge Hammerman to be the brothers Kapiloff. Once the true owners were determined, Ganter's possessory interest ceased.

---

**2.** Art. 5 of the Maryland Constitution, Declaration of Rights provided in pertinent part:
"That the Inhabitants of Maryland are entitled to the Common Law of England, ... according to the course of that Law, and to the benefit of such of the English statutes as existed on the Fourth day of July, seventeen hundred and seventy-six; and which, by experience, have been found applicable to their local and other circumstances, and have been introduced, used and practiced by the Courts of Law or Equity; ... except such as may have since expired, or may be inconsistent with the provisions of this Constitution; subject, nevertheless, to the revision of, and amendment or repeal by, the Legislature of this State...."

**3.** *See* Gilbert, *Maryland Tort Law Handbook* § 9.4 (1986).

*Summary Judgment*

Maryland Rule 2–501(a) provides in pertinent part: "Any party may file at any time a motion for summary judgment on all or part of an action on the ground that there is no genuine dispute as to any material fact and that party is entitled to judgment as a matter of law...."

Pursuant to the rule the court may summarily determine whether there is a bona fide issue between the parties making a full trial appropriate. *Wolfe v. Lamar & Wallace, Inc.,* 261 Md. 174, 274 A.2d 121 (1971). If the pleadings, depositions, admissions, and affidavits demonstrate that there is no genuine dispute as to any material fact, the movant is entitled to judgment as a matter of law. *Delia v. Berkey,* 41 Md.App. 47, 395 A.2d 1189 (1978), *aff'd* 287 Md. 302, 413 A.2d 170 (1980).

Ganter asserts that the judge erred in granting summary judgment in favor of the Kapiloffs because there were genuine disputes of material fact.

Ganter is mistaken. The disputes he perceives as genuine and material are in actuality picayune and immaterial. We refer to but a few of them:

To overcome the Kapiloffs' assertion of ownership, Ganter retorts that either of the brothers *may* have sold the stamps without the other's knowledge. That possibility, he avers, is sufficient to carry the question of ownership to a jury. We disagree. As we see it, Ganter's "dispute" is but sheer speculation entitled to no consideration.

Ganter alleges that because he says he possessed the stamps for a few years there is an inference that he owned them. We have already seen that the law is to the contrary, excepting, of course, where there is a possibility of adverse possession, which is not here applicable.

Another "dispute" advanced by Ganter is that the stamps may not be the same ones that the Kapiloffs own. That theory, while interesting, lacks support in the record, particularly when the Kapiloffs maintain that the particular stamps in question are theirs and an expert, Robert A.

Siegel, who sold the stamps to the Kapiloffs, supports their claim of ownership. Although an expert employed by Ganter opined that there were thousands of stamps circulated, his statement does not in any manner contest that of Siegel or the Kapiloffs that the stamps found by Ganter were the precise stamps owned by the Kapiloffs.

Ganter hypothesizes that because the Kapiloffs failed to insure their stamp collection they were not the true owners. The logic of that hypothesis totally and completely eludes us. It may have been an unwise business practice not to insure the stamps, but the lack of insurance is irrelevant to ownership.

Ganter has advanced what appear to be ideas, notions, concepts, and fantasies of what might have been. However they are called, they are not genuine disputes of material facts.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.