Pearline PEART, Appellant,

v.

DISTRICT OF COLUMBIA HOUSING
AUTHORITY, Appellee.

No. 07–CV–1003.

District of Columbia Court of Appeals.

Argued Dec. 2, 2008.
Decided June 4, 2009.

Peter Wilson, with whom Barbara McDowell and Julie Becker, Legal Aid Society, and David A. Reiser were on the brief, Washington, for appellant.

Alex Chintella, with whom Frederick A. Douglas, Washington, Margaret McFarland, and Hans Froelicher, IV, Acting General Counsel, were on the brief, for appellee.

Before WAGNER, NEBEKER and STEADMAN, Senior Judges.

STEADMAN, Senior Judge:

Ms. Pearline Peart ("Ms.Peart") brought a successful rent abatement action alleging Housing Code violations against her Section 8 landlord, Ms. Nicole Jackson ("Ms.Jackson") and won a rent abatement award of over $15,000. However, the District of Columbia Housing Authority ("DCHA") intervened and successfully asserted a derivative right to all of this award. Ms. Peart concedes that DCHA is entitled to the rent abatement, but con-

tends that the equitable doctrine of unjust enrichment entitles her to compensation from DCHA for her attorneys' fees and costs in the litigation that resulted in the award. We agree that the doctrine applies here. We therefore remand the case to allow the trial court to determine what compensation is due Ms. Peart.

## I. Factual and Procedural Background

Ms. Peart was the lessee from Ms. Jackson of a three-bedroom apartment. The lease was made pursuant to the federal government's Department of Housing and Urban Development ("HUD") Housing Choice Voucher Program ("HCVP"), otherwise known as the "Section 8" program. Under the HCVP program, HUD distributes federal funds to local public housing agencies, in this case DCHA, to provide rental assistance to low-income families. 42 U.S.C. § 1437f (2006). To receive HCVP funds for renting the apartment, Ms. Jackson entered into a Housing Assistance Payment ("HAP") contract with DCHA. DCHA may pay all or some of the rent on behalf of low-income residents; Ms. Peart was a "zero rent tenant." 24 C.F.R. § 982.451. Thus, DCHA paid the entirety of Ms. Peart's rent on her behalf.

After Ms. Peart challenged an unauthorized rent increase,[1] Ms. Jackson filed a complaint for possession and non-payment of rent against Ms. Peart in the Landlord Tenant Branch of the Superior Court. Ms. Peart, through counsel, filed an answer, counterclaim and recoupment seeking the return of moneys she paid to Ms. Jackson pursuant to the unauthorized revised lease, as well as the "rent paid to

[Ms. Jackson] from the beginning of her tenancy to the present based on [Ms. Jackson's] breach of the implied warranty of habitability."

After Ms. Jackson twice failed to appear or answer the counterclaim, the trial court dismissed her complaint and entered a default judgment on Ms. Peart's counterclaim. The court scheduled an *ex parte* proof hearing to hear evidence on the amount of rent to be abated. A month prior to the hearing, counsel for Ms. Peart sent a letter to DCHA alerting it that Ms. Peart intended to seek abatement of all rent moneys that she and DCHA had paid to Ms. Jackson during her tenancy. Two days before the proof hearing, DCHA intervened by filing a Complaint for Declaratory Judgment ("Complaint") and claimed "100% of the amount [the] court determines is to be abated due to … [Ms. Jackson's] breach of warranty of habitability." The Complaint's claim to funds was, by its own terms, entirely derivative. DCHA sought to recover the funds "only in the event [the court determines] Ms. Peart is entitled to the relief sought in her counterclaim."

At the proof hearing, Ms. Peart presented evidence, including thirty-seven exhibits, that Ms. Jackson failed to properly maintain the apartment. The evidence showed "substantial" violations of the Housing Code warranting a rent abatement of 30%, or $15,670. Counsel for DCHA was present at the hearing, but offered no evidence and made no argument relating to the extent and nature of the violations, and expressed no opinion on the appropriate percentage of abatement.

---

1. Ms. Peart paid the additional $127 due under the rent increase out of her own pocket for three months before becoming aware that the increase was illegal. The trial court's judgment included a refund of these payments to Ms. Peart, plus the refund of a fifty dollar late fee, and reimbursement for Ms. Peart's expenses in making repairs. Her right to receive and retain the refund for the rent that she paid and the repair expenditure is not in issue.

The trial court entered a judgment determining that the rent should be abated in the amount of $15,670. It awarded this entire amount to DCHA, citing our decision in *Anderson v. District of Columbia Hous. Auth.*, 923 A.2d 853 (D.C.2007) [hereinafter *Anderson II* ]. The court also rejected Ms. Peart's claim to attorneys' fees and costs from DCHA.

On appeal, Ms. Peart correctly does not challenge the trial court's ruling awarding the abatement to DCHA. *Anderson II* establishes that, to the extent an abatement award is based on rent paid by DCHA, the abatement has the character of "public funds" and, where DCHA makes a claim to the abatement, it prevails over the competing claim of the tenant. *Id.* at 864. On the other hand, absent such a claim by DCHA, the funds belong to the tenant, a principle established by our prior holding in *Multi–Family Mgmt., Inc. v. Hancock*, 664 A.2d 1210, 1221, 1224 (D.C.1995). *See Anderson v. Abidoye*, 824 A.2d 42, 44 (D.C. 2003) [hereinafter *Anderson I* ] (describing holding in *Multi–Family* ). Thus, these cases set up a hierarchy of property rights in an abatement award, in which the tenant is junior to DCHA. We did no more.

Ms. Peart is correct, then, in her assertion that her right to compensation for attorneys' fees and costs remains an open issue for us now to decide.[2] She contends that she is entitled to such recovery both under the common-fund doctrine exception to the "American Rule" on award of attorneys' fees and on equitable principles of unjust enrichment. We turn to those arguments. We first review the legal principles underlying Ms. Peart's claim to recovery in unjust enrichment, and then discuss the related common-fund doctrine which informs our analysis.

## II. Unjust Enrichment

"Unjust enrichment occurs when: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C.2005); *4934, Inc. v. District of Columbia Dep't of Employment Servs.*, 605 A.2d 50, 55 (D.C. 1992) ("Unjust enrichment occurs when a person retains a benefit (usually money) which in justice and equity belongs to another."); RESTATEMENT (FIRST) OF RESTITUTION § 1 cmt. a (1937). "In such a case, the recipient of the benefit has a duty to make restitution to the other person 'if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for [the recipient] to retain it.' " *4934, Inc., supra*, 605 A.2d at 55–56 (quoting REST. RESTITUTION § 1). Unjust enrichment is quasi-contractual in nature (based

---

**2.** The fact that the abatement moneys are "public funds" does not mean that a tenant can assert no lawful claim relating thereto. The federal and state governments routinely pay successful litigants from the public treasury, and the public character of the funds stands as no obstacle. *See, e.g., Niagara Mohawk Power Corp. v. Bankers Trust Co. of Albany*, 791 F.2d 242 (2d Cir.1986) (permitting utility company to proceed in *quantum meruit* against HUD); *Trans–Bay Eng'rs & Builders, Inc. v. Hills*, 179 U.S.App. D.C. 184, 195–87, 551 F.2d 370, 381–83 (1976) (authorizing contractor to proceed against HUD under unjust enrichment theory); *Mandel v.* *Hodges*, 54 Cal.App.3d 596, 127 Cal.Rptr. 244 (1976) (affirming award of attorneys' fees, payable from state treasury, under the "substantial benefit rule"). Indeed, as we have already noted, the "public funds" characterization of the abatement does not prevent the tenant from obtaining full rights to the abatement in the absence of a demand by DCHA. No issue of sovereign immunity is raised by DCHA, and we are not compelled to consider the issue because DCHA is a "corporate body" that has "a legal existence separate from the District government." D.C.Code § 6–202 (2001).

on a contract implied in law), and recovery will be had in restitution. *TVL Assoc. v. A & M Const. Corp.*, 474 A.2d 156, 159 (D.C. 1984). "Thus the doctrine of unjust enrichment depends on whether it is fair and just for the recipient to retain the benefit, not on whether the person or persons who bestowed the benefit had any duty to do so." *4934, Inc., supra*, 605 A.2d at 56. Ordinarily, in the absence of a close family relationship, a "promise to pay will be implied in law when one party renders valuable services that the other party knowingly and voluntarily accepts." *Brown v. Brown*, 524 A.2d 1184, 1186 (D.C. 1987). Whether unjust enrichment occurred is a question of law that this court reviews *de novo*. *Kramer Assoc. v. Ikam, Ltd.*, 888 A.2d 247, 254 (D.C.2005).

▪ As we explained in *Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins. Co.*, 870 A.2d 58 (D.C.2005), in evaluating whether a party has been unjustly enriched, we must consider whether DCHA received the benefit of Ms. Peart's services and, if so, "whether it is fair and just" to receive them without compensating her. *Id.* at 63 (quoting *4934, Inc., supra*, 605 A.2d at 55–56). We evaluate claims of unjust enrichment on a case-by-case basis, considering the particular circumstances giving rise to the claim. *See Fred Ezra Co. v. Pedas*, 682 A.2d 173, 176 (D.C.1996) (examining unjust-enrichment claim under the "circumstances").

We conclude that Ms. Peart stated a valid equitable claim under unjust enrichment. We are guided by several considerations. First, the manner in which DCHA profited from Ms. Peart's action against her landlord convinces us that equity requires DCHA to compensate her for her

efforts. Second, we are unpersuaded by DCHA's arguments that it was not unjustly enriched. Finally, the analogies we draw between the facts of the present case and examples drawn from property law support Ms. Peart's recovery. We discuss each of these considerations in turn.

The facts of this case, as we understand them, demonstrate Ms. Peart's virtual singlehanded efforts in obtaining the moneys that enriched DCHA. Ms. Peart informed DCHA by letter a month before the hearing that she would seek abatement of rent moneys based on the landlord's violation of the Housing Code. Not until two days before the hearing did DCHA respond by filing its complaint for declaratory judgment and asserting its claim to the abatement. DCHA then entered an appearance at the proof hearing, but did so solely to protect its own contingent right to any moneys that might be recovered. It is unconstested that DCHA did nothing at the trial level to assist Ms. Peart in establishing the facts and amount of the rent abatement. Ms. Peart thus conferred a two-fold benefit on DCHA: not only did Ms. Peart's efforts produce a fund that DCHA recovered to apply to the HCVP program, but more importantly, it also saved DCHA from the expense of prosecuting the action itself, or of pursuing available administrative remedies to recover the abatement.[3] *See* REST. RESTITUTION § 1, cmt. b (noting that a party confers a benefit on another where it produces not only an affirmative pecuniary advantage, but also "saves the other from expense or loss"). DCHA knowingly accepted Ms. Peart's services, and explicitly relied on her efforts to secure a recovery for itself.

---

**3.** DCHA acknowledged at oral argument, however, that where withholding future rent payments as a means of recovering an abatement are unavailable (such as where the HCVP tenancy has ended), DCHA would be forced to sue the landlord in court, much as Ms. Peart did in this case.

DCHA counters that it was not unjustly enriched, for three principal reasons.[4] First, DCHA claims that permitting Ms. Peart to retain any portion of the abatement would unjustly enrich her at DCHA's expense. We acknowledge that *Multi–Family* suggests a no-rent HAP tenant might be unjustly enriched if he or she were allowed to retain abatements of rent actually paid by DCHA on her behalf. *Multi–Family, supra,* 664 A.2d at 1222. But, as we have already noted, that case, and the two *Anderson* cases, do not address the present situation-where the HAP tenant seeks compensation for a *service* she provided to DCHA. We reject DCHA's contention that permitting Ms. Peart to recover the value of the benefit she conferred on DCHA would constitute unjust enrichment in her favor. Rather, the question remains whether refusing to permit her to recover the value of the benefit she conferred on DCHA enriches *it* at her expense.

Second, DCHA argues that it was not unjustly enriched by Ms. Peart's successful efforts to secure the rent abatement because its purpose in intervening in the litigation was not to recover the abatement, but rather to protect public funds. This contention is not persuasive. Operating under a mandate to aid "low-income families in obtaining a decent place to live," DCHA necessarily has an interest in recovering rent abatements resulting from landlord violations of housing codes and thus furthering the statutory aim. 42 U.S.C. § 1437f.[5]

Third, DCHA makes the related claim that Ms. Peart conferred no benefit on it because DCHA can recover rent abatements from the landlord directly under the federal regulatory scheme governing HAP contracts by various means, including, for example, withholding of future rent payments.[6] DCHA's argument that it had alternative means of obtaining rent abatement in this case, if true, bolsters, rather than weakens, Ms. Peart's case. Informed that Ms. Peart would counterclaim for a rent abatement against Ms. Jackson, DCHA did not join in Ms. Peart's action as a plaintiff. Despite the administrative avenues available to DCHA to withhold or recoup rent moneys paid to Ms. Jackson

4. DCHA also contends in its brief that a party is not unjustly enriched when it pursues a "claim to get something belonging to someone else." DCHA mistakes our decisions in *Multi–Family* and *Anderson I,* which make clear that a HAP tenant may recover abated rent if DCHA does not intervene to claim it. Thus, it is not accurate to suggest that the HAP tenant has *no* claim to abated rent. *See Anderson I, supra,* 824 A.2d at 44 (citing *Multi–Family, supra,* 664 A.2d at 1221, 1224–25, 1230)).

5. Procuring rent abatements from participating landlords who receive federal money in exchange for deficient housing not only recaptures those moneys for use in providing housing for other low-income families, but also avoids squandering federal funds on landlords who provide substandard housing. Indeed, HUD "pays rental subsidies so eligible families can afford decent, safe and sanitary housing." 24 C.F.R. § 982.1(a)(1). HAP tenants receive assistance to "rent units that meet program housing quality standards." *Id.* at (a)(2). HUD prescribes extensive quality standards which guarantee the unit is habitable, sanitary and safe. *See* 24 C.F.R. § 982.401. HUD regulations require the local housing agency administering the contract (in this case DCHA) to take "prompt and vigorous action to enforce" the owner's obligations, and specifies that it "must not make any housing assistance payments for a dwelling unit that fails to meet" the housing quality standards. 24 C.F.R. § 982.404(a).

6. DCHA's enforcement rights against HAP tenants "include recovery of overpayments, *abatement* or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract." 24 C.F.R. § 982.453 (emphasis added).

during the period in question, it appears to have pursued none.[7] Rather, the record shows that DCHA adopted a posture calculated to ensure maximal recovery with minimal cost and effort. That approach, as DCHA's complaint for a declaratory judgment reveals, led it to condition its recovery on Ms. Peart's success. DCHA thus accepted the benefits of Ms. Peart's services, involving itself only so far as to capture the benefit of those services while protecting its own interests. Having taken no action of its own to recover the rent payments in question from Ms. Jackson, and having hitched its wagon to Ms. Peart's horse, we deem that it would be inequitable under the circumstances to permit DCHA to retain the benefit of her services without paying its fair share of Ms. Peart's litigation expenses. *See* REST. RESTITUTION § 1.[8]

As we have previously noted, Ms. Peart is no meddlesome interloper here. *See Irvine v. Angus*, 93 F. 629, 633 (9th Cir. 1899) ("A mere volunteer is not entitled to be repaid money which he has expended for the benefit of another."). Because DCHA intervened to capture the benefit of Ms. Peart's services, we are not prepared to characterize DCHA as merely the incidental beneficiary of her efforts.[9] *See Jett v. Merchants & Planters Bank*, 228 F.2d 156, 159 (4th Cir.1955) ("[W]here benefits

incidentally accrue to others as a result of the proper discharge of counsels' duty to their own client, such services may well be noncompensable."); ROBERT L. ROSSI, AT-TORNEY FEES § 7.6, at 7–16 (3d ed.2002) (noting that common-fund recovery may be denied where benefit is "incidental"). That Ms. Peart acted in her own interest, and not to further DCHA's, does not preclude her from recovering in unjust enrichment where DCHA took proactive steps to benefit from her efforts. *See District of Columbia v. Green,* 381 A.2d 578, 581 (D.C.1977) (concluding that common fund award appropriate against rebates due taxpayers who benefitted from challenge to tax assessment even though plaintiffs "stated repeatedly their purely selfish, monetary purpose and conceded" that the suit was not brought to vindicate rights of others) (internal citations omitted); *Wallace v. Fiske*, 80 F.2d 897, 909 (8th Cir. 1935) (attorney permitted recovery to avoid unjust enrichment of bond holders where he acted solely in his client's interests, and thereby benefitted non-parties, even though they had opposed the action and had hired their own attorneys).

Rather, Ms. Peart and DCHA together have a property interest in the rent abatement, with DCHA holding the greater claim in event of conflict. *See Anderson I, supra,* 824 A.2d at 44; *Multi–Family, su-*

7. DCHA stated at oral argument that it had withheld rent payment from Ms. Jackson for housing deficiencies in the past, but had not done so during the period in question. It is unclear that DCHA could have done so in this case, because although it appears that Ms. Peart was in her unit at the time of the ex parte proof hearing in April 2007, it also appears that she had vacated by July of that year.

8. Of course, DCHA was not unjustly enriched with respect to the $487.86 she recovered, and was allowed to personally retain, representing the amount she overpaid to Ms. Jackson and spent to fix the violations. That she

recovered some money for herself, which pales in comparison to the $15,670 to which DCHA was entitled, does not operate to forfeit her unjust enrichment claim. The trial court is clearly competent to consider Ms. Peart's personal recovery in calculating the value of her services.

9. The law is reluctant to "force a person to pay for a benefit which he did not bargain to receive or pay for," and a party is not unjustly enriched for receiving "the unavoidable consequence of action taken by the plaintiff in pursuit of his own interests." II GEORGE PALM-ER, THE LAW OF RESTITUTION § 10.7, at 417 (1978).

*pra*, 664 A.2d at 1221, 1224. Such ranking of property interests is hardly a unique phenomenon. A venerable example at common law was the right of a finder of a jewel (a "chimney sweeper's boy") to recover the full value of the jewel against a converter, even though the finder's property interest (contrary to the playground rhyme) was junior to that of the true owner. *Armory v. Delamirie*, 1 Str. 505, 93 Eng. Rep. 664 (K.B.1722); *see also Ganter v. Kapiloff*, 69 Md.App. 97, 516 A.2d 611, 613 (1986) ("[H]e who finds lost personal property holds it against all the world except the rightful owner."); 1 AM. JUR. 2d, *Abandoned, Lost and Unclaimed Property* §§ 27, 35. Concurrent and successive estates and priority of liens are other examples. Courts often permit a party who incurs an expense in preserving or protecting property with whom she shares a concurrent interest to recover in contribution from that third party.

"The finder of lost goods is entitled to recover from the owner his or her necessary and reasonable expenses incurred in the recovery and preservation of the goods." 36A C.J.S. *Finding Lost Goods* § 4 (2003) and cases cited. *See also Chase v. Corcoran*, 106 Mass. 286, 288 (Mass. 1871); *Hartford Fire Ins. Co. v. Albertson*, 59 Misc.2d 207, 298 N.Y.S.2d 321 (N.Y.Co. Ct.1969) (restitution allowed for storage and towing services in protection of property of another); REST. RESTITUTION § 117(1) (indicating that a finder can recoup expenses where finder "intended ... to retain the things as his own if the identity of the owner were not discovered."). Likewise, the owner of property may recover his share of expenses from his co-owner for efforts necessary to protect and preserve the shared property. *Bina v. Bina*, 213 Iowa 432, 239 N.W. 68, 71 (Iowa 1931) (requiring joint contribution by dominant and servient owners of easement for necessary repairs); REST. RESTITUTION § 105(2) ("A person who through legal proceedings procures or preserves property in which he and another have an [sic.] interest may be entitled to reasonable compensation for his services and restitution for his expenses in obtaining or preserving the property."); RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 24 (Tentative Draft No. 2, (2002)).[10]

■ Restitution will also obtain where a party takes protective action that benefits another—such as paying taxes due on property—merely to protect his own interest in that property, and even where his interest is disputed at the time of payment. *See Irvine, supra*, 93 F. at 633–34 (party entitled to restitution where he paid taxes on property to preserve his interest as an owner, even though his right was contested, and was deemed merely a lienholder). Accordingly, and though they owe no duties to each other to do so, junior and senior mortgagees may recover in restitu-

---

10. Tentative Draft No. 2 of the RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 24, states:

> If one person's reasonable and necessary expenditure to maintain or protect an interest in property relieves a second person of an obligation, or spares the second person and otherwise necessary expense, by virtue of the second person's interest in the same property, the first person has a claim in restitution against the second as necessary to prevent unjust enrichment.

The Draft notes that "[t]he required nexus between the property interests of the restitution claimant and defendant may also exist where the interest of one or both parties is less than full ownership, notably where it is equitable rather than legal." *Id.* cmt. c. The Draft also extends the right to restitution to cases in which the "interest in property that the claimant acts to protect may be contingent" or "disputed at the time of the expenditure, with the result that it is revealed, in hindsight, to have been no interest at all...." *Id.* cmt. d.

tion from one another where one pays the taxes on property to protect their liens thereon.[11]

All the foregoing considerations move us to conclude that Ms. Peart has made out a cognizable claim in unjust enrichment. Equity demands that the trial court consider it.

### III. Common–Fund Doctrine

■ It is true that requests for contribution to attorneys' fee expenditures are often analyzed under the so-called common-fund or common-benefit doctrine. This doctrine, which may fairly be viewed as a subcategory of unjust enrichment, constitutes an exception to the "American Rule" that each party to litigation bears its own attorneys' fees. The doctrine "permits an award of attorneys' fees to a person who preserves or recovers a fund or property for the benefit of others," *Passtou, Inc. v. Spring Valley Ctr.*, 501 A.2d 8, 11–12 (D.C.1985), and operates to " 'spread litigation costs proportionately among all the beneficiaries so that the active beneficiary does not bear the entire burden alone and the 'stranger' beneficiaries do not receive these benefits at no cost to themselves.' " *Id.* at 12 (quoting *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759, 769 (9th Cir.1977)).

The doctrine classically applied to cases in which the litigation actually produced or preserved a common fund for the benefit of a group of which the attorneys' fee claimant was a member. *See, e.g., Trus-*tees *v. Greenough*, 105 U.S. 527 (1882). However, it has been extended to "permit reimbursement in cases where the litigation has conferred a substantial benefit on the members of an ascertainable class...." *Passtou, supra*, 501 A.2d at 13 (quoting *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 393–94, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970)). Thus, courts apply the doctrine in appropriate cases to avoid unjustly enriching parties who benefit from litigation but do not contribute to the costs of recovery. *Id.* at 12 (noting that the doctrine is "employed to realize the broadly defined purpose of recapturing unjust enrichment.") (quoting John P. Dawson, *Lawyers and Involuntary Clients: Attorney Fees from Funds*, 87 Harv. L.Rev. 1597 (1974)). In particular, courts have applied the doctrine in a broad range of contexts in which one plaintiff's litigation efforts created a pool of money from which others benefitted, or merely conferred a non-monetary benefit on them. *See, e.g., Shlensky v. Dorsey*, 574 F.2d 131, 149 (3d Cir.1978) (shareholder derivative suit); *Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162, 1165 (Del.1989) (non-monetary benefit).

■ DCHA argues that the present case is different because the positions of Ms. Peart and DCHA were adverse as to rights to the fund created by the rent abatement, citing *Hobbs v. McLean*, 117 U.S. 567, 6 S.Ct. 870, 29 L.Ed. 940 (1886), and *United States v. Tobias*, 935 F.2d 666

---

11. *See Crompton v. Jenson*, 78 Utah 55, 1 P.2d 242, 248 (Utah 1931) ("The payment of taxes was necessary for the preservation of the mortgaged property, and the money so paid, together with legal interest thereon from and after the date of payment, is entitled to priority over plaintiff's mortgage."); *Des Moines Sav. Bank & Trust Co. v. Eisenmenger*, 183 Minn. 46, 235 N.W. 390, 391–92 (1931) (junior mortgagee entitled to reimbursement for taxes paid); *Wyoming Building & Loan Ass'n*

*v. Mills Const. Co.*, 38 Wyo. 515, 269 P. 45, 49 (1928) (foreclosing mortgagee subrogated to proceeds of foreclosure to the extent of taxes paid as it did not do so as a volunteer, but to protect its lien); *Fischer v. Woodruff*, 25 Wash. 67, 64 P. 923, 924–25 (1901) (junior mortgage entitled to reimbursement of taxes paid, and at higher priority with respect to foreclosure proceeds than senior mortgagee); *Ringo, Ex'r v. Woodruff*, 43 Ark. 469 (Ark. 1888) (same).

(4th Cir.1991). The common-fund doctrine did not apply in either *Hobbs* or *Tobias* because the party seeking contribution had performed no service to procure or benefit the fund. *Hobbs, supra,* 117 U.S. at 581, 6 S.Ct. 870 ("[I]t is sufficient to say that the defendant rendered no services whatever in the recovery of the fund."); *Tobias, supra,* 935 F.2d at 668–69.[12] Here, the positions of Ms. Peart and DCHA were identical vis-a-vis the landlord; both sought the creation of the common fund and, more importantly, both had legitimate property interests in the fund, albeit one's claim was junior to the other.

A useful illustration can be found in insurance subrogation cases, where courts regularly make common-fund awards. In that context, the plaintiff can recover attorneys' fees from the insurance company who is subrogated to his recovery "based on the equitable notion that, because an insurer is entitled to share, to the extent of its subrogation interest, in any recovery its insured achieves against a tortfeasor, the insurer should share a proportionate share of the burden of achieving that recovery—including a pro rata share of the insured's

attorney fee." *Gov't Employees Ins. Co. v. Capulli,* 859 So.2d 1115, 1119 (Ala.Civ.App. 2002). The law of worker's compensation present another example. *See Kavanaugh v. City of Sunnyvale,* 233 Cal.App.3d 903, 284 Cal.Rptr. 698, 700 (1991) (noting that where an injured worker sues and recovers from a third-party tortfeasor, the worker's employer is entitled to recover from that money the benefits it has already paid, but not without paying its share of the employee's attorneys' fees if it did not assist with the lawsuit). Thus, courts have awarded fees from a common fund where one party, by dint of litigation, recovers a fund to which a third party has a superior claim. Courts have looked favorably upon fee awards even where the nature and extent of the subrogation claim is disputed, or where there exists some adversity between the claimants as to their respective rights in the fund.[13] We conclude that adversity with respect to the underlying action, not with respect to how the captured funds should be distributed where both have legitimate interests, should affect the applicability of the common-fund doctrine.[14] The former, not the

12. The court in *Hillenbrand v. Meyer Medical Group, S.C.,* 308 Ill.App.3d 381, 241 Ill.Dec. 832, 720 N.E.2d 287 (1999), characterized the *Tobias* decision as having turned on principles of estoppel. *Id.* at 292.

13. *See Hillenbrand, supra* note 12, 720 N.E.2d at 292. In *Hillenbrand,* the court acknowledged that a dispute existed between the insurer and the insured with respect to the extent of the former's subrogation interest. The presence of the dispute did not make the common fund inapplicable. *Id.*

14. As the Supreme Court of Illinois noted in *Baier v. State Farm Ins. Co.,* 66 Ill.2d 119, 5 Ill.Dec. 572, 361 N.E.2d 1100 (1977), where it examined the adversarial relationship between the attorney, the plaintiff-insured (subrogor) and insurer (subrogee) in context of the attorneys' equitable right to charge a fee against the insurer's recovery from a third-

party tortfeasor under its subrogation interest:

The fee, if any, which an attorney receives from a subrogee under the fund doctrine is in partial payment for his services in creating the fund from which the subrogee benefits. In the creation of the fund the client and the subrogee are not adverse litigants; rather they have the same common interest in creating the fund from which each will benefit. Concededly after the fund is created, conflicts may arise between the subrogor and subrogee as to whether, or how much, the subrogee is entitled to recover, or as here between the attorney and the subrogee as to the attorney's right to, or the amount of, a fee. A conflict which arises in the distribution of the fund, however, does not involve the type of adverse interest which would preclude an attorney from properly representing both the subrogor and subrogee.

latter, tests for what should be the real concern to courts—avoiding the authorization of attorneys' fees between adverse litigants akin to simple fee-shifting.[15]

## IV. The Proper Measure of Recovery

For the foregoing reasons, we are quite satisfied that the trial court had the authority to make an award to Ms. Peart. It does not inexorably follow, however, that the amount of that award must fully equal her reasonable attorneys' fees and costs. Such an approach would measure her recovery based on the loss *she* incurred in procuring the benefit DCHA accepted and from which it profited. An award based on the value of her services would amount, in effect, to damages under a contract implied *in fact.*

■ Where there has been an unjust enrichment, the plaintiff's remedy is restitution, which is typically measured by reference to the defendant's *gain* rather than the plaintiff's *loss.* *Slick v. Reinecker,* 154 Md.App. 312, 839 A.2d 784, 797 (2003)

(citation omitted); 1 Dan B. Dobbs, Dobbs Law of Remedies: Damages, Equity, Restitution § 3.1, at 280 (2d ed. 1993) ("Restitution, in contrast, begins with the aim of preventing unjust enrichment to the defendant.... To measure restitution, courts look at the defendant's gain or benefit.").

■ Accordingly, Ms. Peart's restitution interest is to be measured by reference to the value of her services *to* DCHA, not by reference to the actual costs Ms. Peart incurred in providing them. To be sure, it would appear that ordinarily measuring that benefit by the actual cost to the claimant will provide a reasonable approximation of an appropriate award. Technically, however, the restitution interest is measured here by the reasonable value to DCHA of Ms. Peart's services in terms of what it would have cost DCHA to furnish the services itself. *See* Restatement (Second) of Contracts § 371 (1981). Such a calculation should also reflect the services that DCHA actually provided in securing the award[16] as well as an appropriate allo-

*Id.* at 1103; *see also* Johnny Parker, *The Common Fund Doctrine: Coming of Age in the Law of Insurance Subrogation,* 31 Ind. L.Rev. 313, 336–37 (1998) ("An adversarial position ... is not a defense [to a common fund award] if it does not go toward the creation of the fund. Thus, conflicts over ... how much subrogee is entitled to or between the attorney and subrogee ... do not involve the adverse relationship with which the defense is concerned.").

15. DCHA also argues that the common-fund doctrine does not apply here because Ms. Peart could not trace the benefit of the fund to HCVP recipients. We fail to understand the logic of such a position. DCHA is the beneficiary of the fund, even if it were then to distribute the money to Section 8 tenants. DCHA, not those unknown HCVP recipients, received the benefit of Ms. Peart's services, and would have been the one to seek the abatement, and to incur costs in so doing.

16. In challenging any award to Ms. Peart, DCHA claims that the services it provided in

bringing about the recovery constitute an absolute bar to any award. At best we can tell, these services were relatively minimal. The mere retention of an attorney will not necessarily defeat a common-fund award where counsel did nothing to procure the award, and merely directed his or her efforts towards protect the party's interest in the fund. *See, e.g., Draper v. Aceto,* 26 Cal.4th 1086, 113 Cal.Rptr.2d 61, 33 P.3d 479, 484 (2007) (noting that mere retention of attorney is insufficient to defeat common-fund recovery, critical question is whether party contributing towards securing or preserving the fund); *Principal Mut. Life Ins. Co. v. Baron,* 964 F.Supp. 1221, 1224 (N.D.Ill.1997) (applying Illinois law and finding that insured could charge attorneys' fees against fund recovered from which subrogated insurer benefitted because, even though insurer hired attorneys, they "were concerned merely with protecting their client's right to reimbursement, not creating the fund"); *Blue Cross & Blue Shield of Alabama v. Freeman,* 447 So.2d 757, 759 (Ala. Civ.App.1983) (concluding that because the

cation of Ms. Peart's costs attributable to her recovery of her rental overpayments. *See* notes 1, 8, *supra.* . All these considerations may more appropriately be gauged by the trial court in the exercise of its discretion on remand.

The order denying any award to Ms. Peart is vacated and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

"mere appearance as an intervenor by an insurer for the purpose of securing a conditional judgment for its subrogation claim against the amount recovered by its insured does not aid or assist in the recovery of the common fund," such an appearance did not defeat a common-fund claim under the active-participation exception).